2013 BNH 006

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:

                                                               Bk. No. 10-11050-BAH
                                                                Chapter 7

Hopkinton Independent School, Inc.,

       Debtor

*Michael S. Askenaizer*
*Nashua, NH*
*Chapter 7 Trustee*

*Gregory A. Moffett*
*Preti Flaherty, PLLP*
*Concord, NH*
*Counsel to the Chapter 7 Trustee*

*Michael McCormack*
*Representing the United States of America*
*on behalf of its agency*
*The United States Department of Agriculture*
*Concord, NH*
*Assistant U.S. Attorney*

## MEMORANDUM OPINION

### I.  INTRODUCTION

      The Court has before it Claim 5-4, in which the United States Department of Agriculture (the "USDA") claims entitlement to a $16,962.18 administrative expense pursuant to 11 U.S.C. §§ 503(b) and 507(a)(2).  The chapter 7 trustee objects to the allowance of this priority claim.  For the reasons set forth below, the Court finds that the $16,962.18 claim is not allowable as an administrative expense and should be disallowed against the estate.

The Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTUAL BACKGROUND

The parties do not dispute the relevant facts. On March 11, 2010, the debtor, Hopkinton Independent School, Inc., (the "Debtor") filed a voluntary petition pursuant to chapter 7 of the Bankruptcy Code. Michael S. Askenaizer was appointed chapter 7 trustee (the "Trustee") for the Debtor's estate. Shortly thereafter, the USDA filed Proof of Claim 5-1 asserting a claim of $714,475.86, secured by several mortgages on the Debtor's real property located at 20 Beech Hill Road, Hopkinton, New Hampshire (the "Property").

During April 2010, the Trustee and the USDA discussed the process by which the Trustee might attempt to market and sell the Property. Their discussions included the subject of who would pay to preserve and maintain the Property while the Trustee marketed it for sale. To this end, the Trustee informed the USDA that the estate had no money on hand to pay for the Property's upkeep, and requested that the USDA pay the necessary costs. See Ex. A.1. There is no evidence that the Trustee and the USDA came to any specific agreement about who would ultimately bear the associated costs and expenses, other than a general expectation or hope that the sale proceeds would be sufficient to cover all of those costs and expenses, satisfy the USDA's claim, and generate a dividend for unsecured creditors. On April 20, 2010, the Trustee sought permission to employ Concord Commercial, LLC to market the Property for sale at an asking price of $895,000. The Court approved this request the following day. See Doc. No. 34.

Over the next few months, the USDA paid for various expenses associated with preserving and disposing of the Property. These expenses included landscaping for the area immediately around the Property's structures, the cost of winterization, supplying the Property with electricity to power a fire alarm system as well as the costs of monitoring the system, and property insurance—both liability and casualty. Ultimately, these efforts resulted in the following expenditures, all of which the USDA paid directly to the respective service providers:

| Expense | Amount |
| --- | --- |
| Property Maintenance | $1,000.00 |
| Winterization Costs | $4,000.00 |
| Alarm Costs | $1,626.68 |
| Property Insurance Costs | $10,335.50 |
| TOTAL | $16,962.18 |

See Ex. E.

The Trustee was unable to sell the Property after several months of marketing. In early August 2010, he informed the USDA that he would like to reduce the asking price from $895,000 to between $700,000-$600,000, and also sought the USDA's agreement to limit its claim against the estate so that the Debtor's unsecured creditors might benefit from the Property's sale. See Ex. C.1. The USDA responded that it was unwilling to so limit its claim; that it was confident that it could obtain "very close to" $750,000 at a foreclosure sale, and that given the Trustee's inability to sell the property thus far, the USDA would seek relief from the automatic stay and sell the property on its own—stating that regardless of whether the Trustee or the USDA sold the property, "there will not be any benefit to unsecured creditors, given the amount of the USDA's mortgage." Ex. C.2.

Shortly thereafter, the USDA filed a Motion for Relief from Stay.  Doc. No. 65.  The Trustee, who was continuing in his efforts to sell the Property, initially objected to the lifting of the stay, but he withdrew his objection before the Court held a hearing on the USDA's motion.  The USDA obtained relief from the stay on November 9, 2010, see Doc. No. 79, foreclosed on the Property, and was unable to realize the amount of its initial secured claim.  It eventually filed an unsecured deficiency claim for $393,062.43, asserting that it was entitled to administrative priority for $28,344.49 of that amount.  See Claim No. 5-3.

On February 2, 2013, the Trustee objected to Claim No. 5-3 (the "Objection").  Doc. No. 93.  The Trustee argues that Claim 5-3 should be disallowed to the extent that it seeks administrative priority because—as the USDA acknowledged in August, 2010—the estate received no benefit from the expenditures of the USDA; all the benefit went to the USDA itself when it sold the Property.  The USDA responded to the Objection, stating that all of its expenditures for upkeep of the Property, as specified in the priority portion of its claim, were necessary to preserve property of the bankruptcy estate, and that the Trustee had effectively admitted to the necessity of the expenditures by requesting the aid of the USDA.

The Court held a hearing on the Objection, at which the Trustee and the USDA agreed to stipulate to the foregoing facts.  The Court also ordered the USDA to amend Claim 5-3, based on the USDA's voluntary withdrawal of the portion of its claim that sought post-petition interest.  Doc. No. 116.  The USDA filed Claim 5-4 to effect this amendment, and in the process reduced its administrative priority claim from $28,344.49 to $16,962.18, but increased its overall claim to $396,674.27.[1]  After the parties had made their submissions, the Court took the matter under

---

[1] Because the arguments asserted in Objection to Claim 5-3 apply with equal force to Claim 5-4, the Court did not require that the Objection be amended or restated.  It is unclear whether the reduction in amount of the administrative

Page **4** of **13**

advisement.

## III. DISCUSSION

The only question before the Court is whether the USDA is entitled to an administrative expense for the $16,962.18 included in Claim 5-4. 11 U.S.C. § 503(a) provides that "an entity may timely file a request for payment of an administrative expense."[2] Section 503(b) defines "administrative expense." An administrative expense can include "the actual, necessary costs and expenses of preserving the estate—including wages, salaries, and commissions for services rendered after the commencement of the case." § 503(b)(1)(A)(i). An expense may qualify for treatment under section 503(b) if "(1) the right to payment arose from a postpetition transaction with the debtor" and "(2) the consideration supporting the right to payment was beneficial to the estate of the debtor." Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992) (citing Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976)). As these requirements are presented in the conjunctive, if one is not met, the administrative claimant will not be entitled to the priority. Thus, if a transaction is determined not to have benefitted the estate of the debtor, a court need not also determine whether the transaction took place with the debtor estate.

---

expense claim was due to the withdrawal of the claim for post-petition interest, or for some other reason not in the record.

[2] The USDA did not file a separate motion to request the allowance of administrative expenses. This would have been the proper procedure. See, e.g., In re Lakeshore Constr. Co. of Wolfeboro, Inc., 390 B.R. 751 (Bankr. D.N.H. 2008) (creditor moved for the allowance of administrative expenses by filing a "Motion for Allowance and Payment of Administrative Expense Claim"). Here, the USDA included its administrative expense claim in Claim 5-3 and noted its request for priority under section 507(a)(2) by checking the requisite box on the official form. Thus, the USDA put the burden on the Trustee to raise the issue in Objection to Claim 5-3. The parties agreed to waive any procedural arguments generated by the USDA's failure to file a separate motion so that the Court could more expediently address the merits of the USDA's position. In effect, the Court has treated the USDA's Response to Objection to Claim 5-3 as a request for the allowance of administrative expenses.

If an expense is administrative in nature, it is afforded second priority in payment from the assets of the bankruptcy estate. § 507(a)(2). These requirements are to be construed strictly: "The traditional presumption favoring ratable distribution among all holders of unsecured claims counsels strict construction of the Bankruptcy Code provisions governing requests for priority payment of administrative expenses." Hemingway, 954 F.2d at 4-5. The Court will apply this standard in analyzing whether each type of expense in the USDA's priority claim is "administrative" in nature and therefore entitled to priority in the distribution of the assets of the bankruptcy estate. Additionally, as the USDA is the party requesting the allowance of administrative expenses, it has the burden to prove its entitlement to a priority in the scheme of distribution. Id., at 5.

The Court will first address the $1,000 in property maintenance costs. From the invoices included in Exhibit E and emails in Exhibits A and C, it appears that the property maintenance costs were essentially for mowing the lawn in the area immediately around the school building on the Property. These expenses were incurred in relation to the marketing of the Property for sale, namely to improve its appeal to a prospective purchaser. See Ex. A, April 16, 2010 e-mail from Trustee to USDA ("[T]he school is a beautiful building but it doesn't present well – which could result in lower than optimum offers. The lawns are growing and haven't been mowed and the parking lot and walkways are covered with sand from the winter plowing and sanding.") All of these expenses were incurred between July 2010-October 2010, during the time the Trustee was in possession of the Property and while the automatic stay was in effect.

The Court does not find that these marketing expenses benefitted the Debtor's bankruptcy estate. Although they were incurred while the Trustee had possession of the Property, and while

he was actively marketing it for sale, the Trustee did not end up selling the Property. In fact, the USDA likely received whatever benefit came from this marketing of the Property when it ultimately sold the Property in 2011. And although the property maintenance likely assisted the Trustee's efforts in attempting to sell the Property, the opportunity to market the Property was not "the type of concrete, actual benefit contemplated by § 503(b)(1)(A)." Ford Motor Co. v. Dobbins, 35 F.3d 860, 866-67 (4th Cir. 1994). Because the $1,000 of property maintenance costs did not benefit the estate, they cannot be allowed as administrative expenses.

The Court will address the remaining categories of the requested administrative expenses—winterization costs, alarm costs, and property insurance costs—together, because they are all of the same type: the ordinary costs of owning and preserving the value of the Property, which ultimately benefitted the USDA. The costs of preserving the Property are different in kind than the marketing costs addressed above. The Trustee has a "fiduciary obligation to conserve the assets of the estate and to maximize distribution to creditors." Rigden v. Aldrich (In re Rigden), 795 F.2d 727, 730 (9th Cir. 1986) (citation omitted). Indeed, a trustee can be liable for "not only intentional but also negligent violations of duties imposed upon him by law." Id; accord Barrows v. Bezanson (In re Barrows), 171 B.R. 455, 459 (Bankr. D.N.H. 1994). The failure of a trustee to "carefully preserve the estate's assets from deterioration or dissipation," would be a breach of such duties. Collier on Bankruptcy ¶ 704.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). If the Trustee did not protect the Property from risk of loss and deterioration, he would potentially breach his obligations if such a failure adversely affected the value of the estate's property. Accordingly, had the USDA not paid the preservation costs, the Trustee would likely have been forced to find some way to pay for them (such as, perhaps, a surcharge under section 506(c)), or to

abandon the Property.

Despite the absence of an express agreement between them, the USDA was willing to pay the preservation costs for at least several months while the Trustee attempted to sell the Property. The Court is in a position to see whom those costs benefitted, and while their benefit to the USDA was not as direct as that of the marketing costs, it is clear that the USDA ultimately received whatever benefit they may have generated, in the form of all the Property's sale proceeds. The USDA should not receive an administrative expense for costs that did not benefit the estate. The restrictive view of section 503(b) taken by Hemingway, the purpose of the administrative priority, and the interplay of sections 503(b) and 506(c) convince the Court that this outcome is correct.

The Court must take a narrow view of the expenses to be allowed under section 503(b). In re Diomed Inc., 394 B.R. 260, 265-66 (Bankr. D. Mass. 2008). In line with this narrow view, the expense must have provided a concrete (rather than attenuated) benefit to the bankruptcy estate. For example, in Ford Motor Credit, the debtor-in-possession retained a car dealership, to which Ford Motor Credit held a deed of trust, so that it could attempt to sell the property. 35 F.3d at 863-64. Ultimately, the debtor was unable to sell the dealership, and Ford obtained relief from the automatic stay. After selling the dealership, Ford filed a deficiency claim, which included a priority claim for various expenses incurred while the debtor retained the property. The court held that "we do not believe that the mere opportunity to market collateral is the type of concrete, actual benefit contemplated by § 503(b)(1)(A)." Id. at 866-67. The court's analysis focused on the "critical distinction between an actual benefit to the estate resulting from the actual postpetition use of collateral and a potential benefit to the estate resulting from a debtor's mere possession of collateral." Id. at 867. In that court's analysis, the estate would need to use or sell a creditor's

collateral in order to benefit; possession without use or a completed sale is not beneficial to the estate.  But, if the estate were to sell the collateral and profit from the sale, that sale would constitute an actual use of property that generated a concrete benefit.  In the latter case, the creditor might assert an administrative claim.  See Id.

This contrast is evident in another case, In re Sports Shinko (Florida) Co., Ltd., where the court allowed a creditor an administrative expense priority for the costs of maintenance and utilities services incurred while the chapter 7 trustee marketed and successfully sold estate property.  333 B.R. 483 (Bankr. M.D. Fla. 2005).  In Sports Shinko, the debtor owned about half of the condominium units located in a condominium complex.  The remaining units were owned by a condominium association.  Id. at 489.  During the chapter 7 case, the association paid for grounds maintenance, electricity, and property insurance for all of the condominium units, including those owned by the estate.  Id.  The chapter 7 trustee was able to sell the estate's condominium units, along with other related property, to a single purchaser.  The proceeds were sufficient to pay off multiple secured claims, as well as the trustee's professional fees.  Id. at 491.  The court allowed the association's request for administrative expenses based on the fact that the association's expenditures had accrued directly to the estate's benefit when the condominium units were sold.  The court contrasted the facts before it with other cases in which the chapter 7 trustee "did not use, operate, or sell specific property," where condominium associations were not awarded an administrative expense priority.  Id.

Here, the Trustee did not use, operate, or sell the Property.  The Court finds persuasive the reasoning from Ford Motor Credit that an opportunity to sell property is not an actual benefit to the estate.  In the absence of a sale by the Trustee, the USDA is not entitled to an administrative

Page **9** of **13**

expense for costs it incurred to provide the Trustee with the opportunity to market the Property. Additionally, the facts in this case are not like the facts before the court in Sports Shinko. There, the trustee sold property for the benefit of several secured creditors, and the proceeds were sufficient to cover the trustee's professional fees. The expenditures of the condominium association directly benefitted the estate by maintaining the value of the property, value that was captured by the estate when it sold the property. Here, the only creditor that benefitted from the USDA's expenditures on the Property was the USDA itself. To allow the USDA to recover the costs of maintaining the Property's value, in the form of an administrative expense, would be to allow the USDA a windfall to the detriment of other creditors. In a very real sense, the USDA already recovered this value when it sold the Property.

The statutory purpose of the administrative expense priority also persuades the Court that disallowance of the USDA's claim is proper. The purpose of section 503(b) is to incentivize businesses to provide services to the bankruptcy estate—services that make it possible for chapter 7 trustees to administer the assets of the estate or chapter 11 debtors-in-possession to operate. In re Boston Reg'l Med. Ctr. Inc., 291 F.3d 111, 124 (1st Cir. 2002) ("The justification for this rule is that the administrative priority is necessary to induce potential contractors to do business with the debtor-in-possession, which in turn is necessary to prevent the business from collapsing entirely with the filing."). The test applied to determine whether an expense ought to merit an administrative priority—i.e., whether the transaction was a post-petition transaction with the estate and whether the transaction actually benefitted the estate—is "essentially an effort to determine whether the underlying statutory purpose will be furthered by granting priority to the claim in question." In re Jartran Inc., 732 F.2d 584, 587 (7th Cir. 1984) (discussing and applying the

standard from In re Mammoth Mart, 536 F.2d at 954).

Here, the USDA falls outside the class of entities that section 503(b) was designed to induce to contract with the estate. The USDA's pre-petition mortgage constituted its primary source of recovery on its claim. The USDA's incentive was to protect the Property from loss of value pending a sale (whether by the Trustee or by foreclosure), which it did while permitting the Trustee to attempt to sell the Property, and then by foreclosing. As the holder of a secured claim (even if as an undersecured creditor), its status is qualitatively different from a unsecured post-petition service provider, whose sole source of recovery is as the holder of an administrative expense claim.

The relationship between sections 503(b) and 506(c) also supports the Court's decision. While section 503(b) generally places the burden of the cost of the estate's administration on the estate itself, section 506(c) allows the trustee to shift some of those same costs onto a secured creditor. Section 506(c) provides that "the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." In order for a trustee to recover such costs from a secured creditor, the trustee must establish "(1) the expenditure was necessary, (2) the amounts expended were reasonable, and (3) the secured creditor benefitted from the expenses." In re Parque Forestal, Inc., 949 F.2d 504, 512 (1st Cir. 1991); see also In re Felt Mfg. Co., 402 B.R. 502, 510 (Bankr. D.N.H. 2009).

Although no motion under section 506(c) is before the Court, and the Court is not making an affirmative ruling under that section, the potential application of section 506(c) to the facts of

this case informs the Court's decision about which party should bear the preservation costs of the Property. That the expenditures on winterization, electricity and alarm costs, as well as property insurance, were both necessary and reasonable seems indisputable; the USDA itself willingly paid for these services. And the Court has already decided that these expenditures benefitted the USDA. Indeed, these are the types of costs often recoverable by a trustee under section 506(c). See In re Strategic Labor, Inc., 467 B.R. 11, 22 (Bankr. D. Mass. 2012) ("typical examples of allowed surcharge costs include appraisal fees, auctioneer fees, moving expenses, maintenance and repair costs, and advertising costs") (quoting In re Swann, 149 B.R. 137, 143 (Bankr. D.S.D. 1993)). Thus, it seems that these are the types of costs and expenses that are "reasonable, necessary costs and expenses of preserving" the Property. Were the Court to adopt the USDA's position, on the one hand, the USDA would recover its expenses under section 503(b), but on the other the Trustee might be able to recover the very same expenses from the USDA as a surcharge.[3] The correct application of two different statutory provisions should not lead to a contrary result. See Rake v. Wade, 508 U.S. 464, 471 (1993) ("We generally avoid construing one provision in a statute so as to suspend or supersede another provision. To avoid 'deny[ing] effect to a part of a statute,' we accord 'significance and effect ... to every word.'" quoting Ex parte Public Nat. Bank of New York, 278 U.S. 101, 104 (1928)); Washington Mkt. Co. v. Hoffman, 101 U.S. 112, 116 (1879) ("Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each.") The Court will not allow the USDA to recover costs of preserving its collateral under

---

[3] The Court is not suggesting that sections 503(b) and 506(c) are mutually exclusive, i.e., that if a trustee could potentially recover expenses under section 506(c), these expenses would never be recoverable by a secured party under section 503(b). The Court does suggest that given the specific expenses sought and the unique facts of this case, the result under section 503(b) ought to jibe with the result under section 506(c).

section 503(b) when these are the very types of costs recoverable by a trustee under section 506(c).

## IV. CONCLUSION

For all the foregoing reasons, the Court finds that the USDA's $16,962.18 claim under sections 503(b) and 507(a)(2) ought to be disallowed against the estate. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Bankruptcy Rule of Procedure 7052. The Court will issue a separate order consistent with this opinion.


Date: September 4, 2013           /s/ Bruce A. Harwood
                                  Bruce A. Harwood
                                  Chief Bankruptcy Judge